Filed 2/20/15  In re J.D. CA4/1

## NOT TO BE PUBLISHED IN OFFICIAL REPORTS

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

### COURT OF APPEAL, FOURTH APPELLATE DISTRICT

### DIVISION ONE

### STATE OF CALIFORNIA

| | |
|---|---|
| In re J.D., Person Coming Under the Juvenile Court Law. | D066649 |
| SAN DIEGO COUNTY HEALTH AND HUMAN SERVICES AGENCY,<br><br>        Plaintiff and Respondent,<br><br>        v.<br><br>P.C.,<br><br>        Defendant and Appellant. | (Super. Ct. No. J515495B) |

APPEAL from an order of the Superior Court of San Diego County, Kimberlee A. Lagotta, Judge.  Affirmed.

Suzanne Davidson, under appointment by the Court of Appeal, for Defendant and Appellant.

Thomas E. Montgomery, County Counsel, John E. Philips, Chief Deputy County Counsel and Emily K. Harlan, Deputy County Counsel, for Plaintiff and Respondent.

P.C. appeals from an order of the juvenile court on a juvenile dependency petition filed by the San Diego Health and Human Services Agency (the Agency) on behalf of her minor son, J.D. (born 2013). She contends the court erred when it terminated her reunification services at the contested 12-month review hearing under Welfare and Institutions Code section 366.21, subdivision (f). (Undesignated statutory references are to the Welfare and Institutions Code.) She also argues the juvenile court erred (1) in finding there was no substantial probability of returning J.D. to her custody by the 18-month permanency review hearing and, (2) not extending her services because J.D.'s father, Arthur D., was still receiving services to the 18-month permanency review hearing. We reject her assertions and affirm the order.

## FACTUAL AND PROCEDURAL BACKGROUND

P.C. began using drugs when she was 18 years of age, dropped out of high school her senior year and has reportedly abused methamphetamine daily for 13 years. Between 1999 and 2013, P.C. suffered 88 arrests, most of which were drug-related crimes, but also included domestic violence, immigration crimes, contempt, elder abuse, and child cruelty. In 2004, P.C.'s older son, J.C., was removed from her care due to her methamphetamine use and physical abuse, including burning J.C. with a cigarette and biting his arm. P.C. did not successfully reunify with J.C. and her parental rights were terminated in 2006.

In 2013, P.C. gave birth to J.D. She admitted drug use throughout her pregnancy and not receiving prenatal care. P.C. has an active criminal protective order against her

stemming from a domestic violence incident with Arthur. The parents, however, admitted to having ongoing contact.

The Agency filed a petition on J.D.'s behalf alleging he was at substantial risk of serious physical harm or illness as a result of his parents' mental illnesses, developmental disability or substance abuse. J.D. was detained in a confidential licensed foster home. At the June 2013 jurisdictional and dispositional hearing, the juvenile court sustained the petition, officially removed J.D. from his parents' custody, placed him in a licensed foster home, and offered reunification services to both parents. P.C. was to obtain a psychological evaluation, a psychotropic medication evaluation, participate in a domestic violence program, individual counseling, an outpatient substance abuse program, drug testing, 12-step meetings, and parenting courses.

At the December 2013 six-month review hearing, the court found P.C. had made some progress with her case plan and Arthur had made substantive progress in his case plan. The court granted additional reunification services to the parents. At the September 2014 12-month review hearing, the juvenile court found Arthur had made substantive progress with his case plan, a substantial probability of return by the 18-month review date, and granted him additional reunification services. The court found the Agency had provided P.C. with reasonable services, but she had made minimal progress in her case plan and a substantial probability did not exist that J.D. would be returned by the 18-month review date. The court terminated P.C.'s reunification services. P.C. timely appealed.

DISCUSSION

I

*Reasonableness of Reunification Services*

A. *General Legal Principles*

The purpose of a reunification plan is "to overcome the problem that led to removal in the first place." (*Blanca P. v. Superior Court* (1996) 45 Cal.App.4th 1738, 1748.) "Each reunification plan must be appropriate to the particular individual and based on the unique facts of that individual." (*In re Misako R.* (1991) 2 Cal.App.4th 538, 545 (*Misako*).) To support a finding of reasonable services, "the record should show that the supervising agency identified the problems leading to the loss of custody, offered services designed to remedy those problems, maintained *reasonable* contact with the parents during the course of the service plan, and made *reasonable* efforts to assist the parents in areas where compliance proved difficult . . . ." (*In re Riva M.* (1991) 235 Cal.App.3d 403, 414.)

"The standard is not whether the services provided were the best that might be provided in an ideal world, but whether the services were reasonable under the circumstances." (*Misako*, *supra*, 2 Cal.App.4th at p. 547.) The remedy for failing to offer or provide reasonable services is to extend the reunification period and continue services. (*In re Alvin R.* (2003) 108 Cal.App.4th 962, 975.) When a party challenges the finding that reasonable services were offered or provided, we determine whether there is substantial evidence to support the court's finding by reviewing the evidence most

4

favorable to the prevailing party and indulging in all legitimate and reasonable inferences to uphold the court's ruling.  (*Misako*, *supra*, at p. 545.)

B.  *Analysis*

P.C. asserts the evidence does not support the juvenile court's finding that the Agency provided her reasonable reunification services.  She contends there is no showing the Agency addressed her posttraumatic stress disorder (PTSD) and it improperly waited until August 2014 – one month before the 12-month review hearing – to initiate a second psychological evaluation.  We address each contention.

1.  *PTSD diagnosis*

In May 2013, a social worker expressed concern about P.C.'s mental health based on claims that she had been raped, including a statement that " 'Michael Harper put me on a love swing and I was raped three or four times.' "  The social worker asked that P.C. be screened by a mental health professional.  In October 2013, she told the psychologist who conducted her psychological evaluation that "she had been raped at least three times in her life" at ages 18, 20 and 27, but she never reported the rapes because she was too " 'embarrassed.' "  The psychologist diagnosed her with PTSD and suggested she should receive "trauma-focused psychotherapy to help her manage the emotional symptoms and distress associated with PTSD."  The psychologist noted that P.C. "present[ed] as child-like in her understanding of the world" and displayed "poor insight, avoidance, and tendency toward debilitating changes in mood and increases in anxiety."  He opined that if P.C.'s PTSD could be treated successfully "she should be able to parent safely and benefit from reunification services."

5

P.C. argues the Agency failed to consider her PTSD diagnosis in designing her services and this failure impeded her ability to fully benefit from all of her other services. The Agency contends P.C. forfeited the right to raise this argument on appeal by failing to raise it below and explicitly arguing the opposite at trial.

P.C. has not pointed us to anything in the record showing her counsel ever argued to the juvenile court that she was not receiving trauma-focused psychotherapy to address her PTSD diagnosis and, accordingly, her services were not reasonable. During closing argument, P.C.'s trial counsel reminded the juvenile court that the professional service providers disagreed about the validity of P.C.'s PTSD diagnosis, stressing that a second psychological evaluation should have been ordered when the disagreement arose regarding the differing diagnoses. While counsel argued P.C. did not receive reasonable services, she never asserted the services were deficient because they did not address her PTSD diagnosis.

Generally, a party is precluded from urging on appeal any point not raised in the trial court. (*In re Riva M.*, *supra*, 235 Cal.App.3d at pp. 411-412.) Although forfeiture is not automatic, we should exercise our discretion to excuse it in rare instances only, particularly in dependency cases. (*In re S.B.* (2004) 32 Cal.4th 1287, 1293.) The record here shows P.C. forfeited the issue by not raising it below. Even if the issue was not forfeited, we would reject it as not supported by the record.

P.C.'s initial case plan, dated June 2013, noted that one of her specific goals for individual therapy was to "address past trauma." In October 2013, a psychologist evaluated P.C. and made the PTSD diagnosis, however, he did not issue his report until

6

January 2014. The social worker testified that upon receiving the report she provided a copy to P.C.'s treating therapist and discussed the report with the therapist.

Although P.C.'s therapist disagreed with the PTSD diagnosis, the social worker testified that the therapist met with P.C. on a weekly basis and was working with P.C. on her coping skills and implementing all the information P.C. was receiving in her various services and programs. The social worker also discussed with P.C.'s therapist the psychologist's recommendation that P.C. receive " 'sensitive and competent trauma focused treatment and parenting education' " and noted this was the treatment the therapist was providing to P.C.

P.C. also participated in substance abuse services from January 2014 to May 2014. P.C.'s care coordinator for this program focused on addressing P.C.'s "mental health in terms of PTSD" as a result of P.C.'s rapes. In a status review report dated June 2014, the social worker recommended that P.C. be offered a trauma-focused psychotherapy and noted this was in progress. In the July 2014 status review report, the social worker noted the psychologist's recommendations and that P.C. was receiving trauma-focused psychotherapy with her individual therapist. At that time, P.C. started missing sessions with the therapist and by August 2014, the therapist informed P.C. her therapy might be terminated if she missed any more sessions.

The social worker also addressed the psychological evaluator's recommendation for trauma-focused parenting education with P.C.'s in-home parenting provider. They discussed breaking down and simplifying the curriculum for P.C. The social worker also

kept in touch with the parenting provider about her concerns, so the provider could further address age milestones and age appropriate behaviors with P.C.

This record does not support P.C.'s contention that the Agency failed to consider her PTSD diagnosis in designing her services. Rather, the record shows P.C. received trauma-focused psychotherapy as recommended by the psychologist evaluator. Moreover, P.C.'s argument ignores other evidence supporting the Agency's recommendation to terminate services, such as P.C.'s resistance to using medication to address her mental health issues, continued exhibition of obsessive and disoriented thought processes, lack of progress in her domestic violence program, inability to demonstrate appropriate parenting skills, and her ongoing contact with Arthur in violation of the criminal protective order.

2. *Second psychological evaluation*

P.C. asserts the Agency improperly waited until August 2014 – one month before the 12-month review hearing – to initiate a second psychological evaluation. She suggests that had a second psychological assessment been conducted earlier the Agency would have been able to better identify her mental health issues and provide services appropriate to her mental health diagnosis. We reject this assertion as speculative.

First, P.C. has not shown that the Agency improperly waited to initiate a second psychological evaluation. The psychological evaluator opined that P.C. should undergo a second psychological evaluation in six to eight months to reassess her treatment needs and evaluate whether she met the diagnostic criteria for bipolar disorder. Although the evaluation was conducted in October 2013, a report was not generated until January

8

2014. The social worker submitted a request for a second psychological evaluation in August 2014, 10 months after P.C. underwent her first evaluation and seven months after the date of the first report.

Additionally, P.C. provided no argument showing how a second psychological evaluation would have changed the type of services she received. P.C.'s initial case plan identified her service objectives as: consistently, appropriately and adequately parenting her child; complying with medical or psychological treatment; maintaining a relationship with her child by following the conditions of the visitation plan; drug testing, staying free from illegal drugs and showing an ability to live free from drug dependency; and expressing anger appropriately and not acting negatively on impulses. To help her meet these objectives, the Agency provided a domestic violence program, general counseling, outpatient substance abuse program, substance abuse testing, parenting education, and they recommended a psychotropic medication evaluation, and psychological testing.

P.C.'s counsel acknowledged that her client participated in an "astounding amount of services," but argued to the juvenile court that P.C. did not resolve her protective issues because the services provided were not reasonable. Counsel also argued that had a second psychological evaluation been ordered earlier there could have been new suggestions on services to resolve her client's protective and mental health issues. As already noted, however, P.C.'s therapist was working with her on her coping skills and implementing all the information P.C. was receiving in her various services and programs. It is highly speculative that additional services would have resolved P.C.'s

9

protective and mental health issues.  Substantial evidence supports the juvenile court's finding that reasonable services were offered or provided to P.C.

## II

### *Termination of Reunification Services*

P.C. asserts the evidence does not support the juvenile court's order terminating her reunification services at the 12-month review hearing.  She argues the juvenile court erred (1) in finding there was no substantial probability of returning J.D. to her custody by the 18-month permanency review hearing, and (2) not extending her services because Arthur would be receiving services to the 18-month permanency review hearing.

Whereas here, a juvenile court finds it would be detrimental to return the child home at the 12-month permanency hearing, the court may continue services to the 18-month date "if it finds that there is a substantial probability that the child will be returned to the [parent's] physical custody . . . and safely maintained in the home within the extended period of time . . . ."  (§§ 366.21, subd. (g)(1), 361.5, subd. (a)(3); *In re K.L.* (2012) 210 Cal.App.4th 632, 641-642.)  This finding is proper only if the parent has: (1) consistently and regularly contacted and visited the child; (2) made significant progress in resolving the problems that led to the removal of the child; and (3) demonstrated the capacity and ability to complete the objectives of the treatment plan and to provide for the child's safety, protection, physical and emotional health, and special needs.  (§ 366.21, subd. (g)(1)(A)-(C).)  These findings have been characterized as establishing "a very high hurdle for continuing the case beyond 12 months."  (*A.H. v. Superior Court* (2010) 182 Cal.App.4th 1050, 1060.)  We review the juvenile court's

finding on this issue for substantial evidence. (*Kevin R. v. Superior Court* (2010) 191 Cal.App.4th 676, 688.)

The purpose of reunification visitation is to "maintain ties between the parent . . . and the child, and to provide information relevant to deciding if, and when, to return a child to the custody of his or her parent . . . ." (§ 362.1, subd. (a).) The juvenile court found P.C. had not maintained regular and consistent contact and visitation with J.D., noting that her visitation had been reduced to once a week and she had missed visits. P.C. admits her visitation had been reduced from twice a week to once a week due to her absence and missed visits. Nonetheless, she contends the facts show she regularly visited J.D. throughout her case and there were no extensive gaps of time where she stopped visitation.

Initially, P.C. was allowed two, two-hour supervised visits with J.D. each week. On August 25, 2014, less than two weeks before the contested 12-month hearing, her visitation was reduced to one, two-hour visit because of "no shows and cancelled visits." Prior to that reduction, P.C. had expressed concern during a visit that J.D. did not seem to know her. This evidence supported the juvenile court's finding that P.C.'s visitation was not regular and consistent. P.C. argues there were never any "extensive gaps" of time where she stopped visitation. We are not persuaded by this argument given J.D.'s tender age and P.C.'s own realization that J.D. did not seem to know her.

P.C. asserts no substantial evidence showed she failed to make significant progress in resolving the problems that led to J.D.'s removal. She cites her negative drug tests and participation in individual therapy and domestic violence sessions. She also notes her

11

completion of a dual diagnosis substance abuse treatment program, an in-home parenting course, a psychological evaluation, and a psychotropic medication evaluation. She argues this evidence demonstrates her capacity and ability to complete the objectives of her treatment plan and successfully parent J.D.

We acknowledge P.C.'s participation and completion of portions of her case plan and commend her for positively addressing her long-standing drug addiction. This is a major step in furthering her well-being. The evidence must also show, however, that she has made significant progress in resolving the problems that led to J.D.'s removal and demonstrate she can provide for his safety, protection, physical and emotional health, and special needs. (§ 366.21, subd. (g)(1)(B), (C).) On these issues the juvenile court found that while P.C. had completed portions of her case plan, her progress was not consistent or substantive. It found P.C. lacked insight into the issues that brought her and her child before the court and continued to blame others for these issues. The court expressed concern that P.C. failed to continue with medication, finding this was "crucial" to her stability and a finding that J.D. would be safe and well cared for in P.C.'s care. The juvenile court also expressed concern that P.C. continues to exhibit disoriented thoughts and statements "which take away from her ability to reasonably deal with [J.D.] in a way that the court would believe she is capable of keeping him safe, protecting him, and caring for him, as a parent should." Substantial evidence supported these findings.

At trial, the social worker testified that P.C. continued to lack insight regarding the issues that brought J.D. before the court, explaining that P.C. did not take responsibility for her actions and was unable to understand why J.D. needed to be removed from her

12

care. Additionally, throughout the reunification period, P.C. displayed thought disorders. P.C.'s individual therapist initially noted that while P.C. could be focused at times, she also presented obsessive, illogical and paranoid thoughts. After nine months of therapy, the therapist reported that P.C. continued to exhibit paranoid and obsessive thinking. The therapist wrote that P.C. "is obsessed with her history of rapes and abuses, prejudices, unfair treatment by the 'system,' how Asian people live off welfare and she can't, hates her mother, her sister. Her tirades go from subject to subject, she has difficulty focusing on how she can improve her life and have her son returned to her." Despite these thought disorders, P.C. did not believe she needed therapy or medication for any of her psychological symptoms.

The court-appointed special advocate expressed concern that despite the services P.C. received, her interactions with J.D. reveal "she still does not fully understand what is expected of [J.D.] at this stage of development and continues to make inappropriate comments towards him." Critically, despite having completed all three modules of her parenting education program in May 2014, P.C.'s therapist noted in her August 2014 report that P.C. "appears lacking in knowledge about the basics of a child's developmental stages and normal growth." P.C.'s therapist also believed that P.C.'s mental problems were concerning as they "seem[ed] to dictate her perceptions of events, her emotional reactivity, and lead to inappropriate behaviors." Notes from visitation monitors supported these observations. During one visit P.C. asked J.D. why he was mad at her after J.D. bumped his head and started crying. During another visit, P.C. was overheard asking J.D. if he knew how to French kiss.

13

This evidence demonstrated P.C. had not made sufficient progress in resolving the problems that led to J.D.'s removal. This evidence also supported the juvenile court's conclusion that P.C. did not have the ability to manage and care for J.D. in a parental manner. Notably, when the court made its decision to not extend services at the 12–month hearing, the 18–month date was only two and a half months away. The juvenile court could have reasonably concluded that continuing to offer services to P.C. amounted to an unwise use of governmental resources. (*In re Alanna A.* (2005) 135 Cal.App.4th 555, 566 (*Alanna*).)

Finally, we reject P.C.'s contention that her services should have been extended because Arthur would be receiving services to the 18-month permanency review hearing. Success or failure in reunification is assessed separately as to each parent. (*In re Jesse W.* (2007) 157 Cal.App.4th 49, 60.) We also reject P.C.'s assertion that the *Alanna* case supports her argument for extension of services as the mother in *Alanna* had her services extended to the 18-month date despite her shortcomings in completing her case plan. While P.C. is correct that the juvenile court in *Alanna* extended the mother's services to the 18-month date even though the Agency found her prognosis for reunification was poor, the father was the appellant in *Alanna* and the mother's extension of services was not at issue. (*Alanna*, *supra*, 135 Cal.App.4th at p. 561.) A case is not authority for a proposition it does not address. (*People v. Alvarez* (2002) 27 Cal.4th 1161, 1176.)

DISPOSITION

The order is affirmed.

McINTYRE, J.

WE CONCUR:

McDONALD, Acting P. J.

IRION, J.